UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOEY SMELLEY,
     Petitioner,

vs.                           Case No.:  3:20cv5902/LAC/EMT

MARK S. INCH,
     Respondent.
_____/

## <u>REPORT AND RECOMMENDATION</u>

Petitioner Joey Smelley (Smelley) filed a counseled petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Respondent (the State) filed an answer and relevant portions of the state court record (ECF No. 6).  Smelley filed a reply (ECF No. 9).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Smelley is not entitled to habeas relief.

## I.      RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 6).[1]  Smelley was charged in the Circuit Court in and for Okaloosa County, Florida, Case No. 2018-CF-179, with burglary of a dwelling with assault or battery (Count 1), grand theft (over $20,000 but less than $100,000) (Count 2), grand theft of a firearm (Count 3), and grand theft auto (Count 4) (ECF No. 6-1 at 18 (amended information)).

On July 18, 2018, Smelley entered a written plea agreement with the State (*see* ECF No. 6-1 at 21–24 (plea agreement)).  The plea agreement encompassed Smelley's four charges in Case No. 2018-CF-179, as well as a charge of felony criminal mischief in Case No. 2017-CF-2858 and a charge of violation of probation (VOP) in Case No. 2017-CF-1072 (*id.*).  Smelley agreed to enter an "open plea" of no contest to the charges to enable him to seek a downward departure sentence (*see* ECF No. 6-1 at 21–24 (plea agreement); ECF No. 1 at 31).  Smelley agreed that the probable cause affidavit(s) filed with the court provided a factual basis for his plea to each of the charges (*id.*).  Specifically with respect to the charges in Case No. 2018-CF-179, the probable cause affidavit set forth the following facts:

---

[1] Citations to the state court record refer to the document numbers and page numbers assigned by the court's electronic filing system.

On September 10, 2017, the Okaloosa County Sheriff's Office received a report of [sic] and responded to 5371 N. Hilton Road, Baker, FL, regarding a Home Invasion Robbery and subsequent stolen vehicle, firearm, precious metals, and monies.  Per sworn Affidavits of Complaint by the victims, two male suspects entered the home surreptitiously through a window of the residence.  The suspects then entered the master bedroom, occupied by Marilyn Maloney and Bruce Hoffman.  Mrs. Maloney awoke and was confronted by the suspects, and was informed that the other occupants of the residence were being held hostage.  The suspects demanded money and guns before fleeing the residence with only Hoffman's wallet.  As the suspects fled, they obtained the keys to a 2005 Lincoln Towncar belonging to Marilyn Maloney's son Robert, who was asleep in a separate bedroom of the residence at the time of the offense.  The suspects departed the property by stealing Robert Maloney's Lincoln Towncar, which at the time contained a bank bag containing approximately $5,000 cash, several collectible silver coins, gold bars, Glock Firearm, and retired law enforcement credentials.  The monetary value of the precious metals is approximated at $22,000.  The manner of the robbery and the seeming familiarity of the suspects with the contents and layout of the residence led investigators to believe from the outset that one if not both or the suspects were known to the victims.

On November 27, 2017, your affiant received a letter from a confidential source claiming to have information identifying the suspects in the robbery.  The letter contained details of the incident which could only be known by the victims or suspects to include a description of the property taken and quotes spoken by the suspects during the offense and reported by Mrs. Maloney.  An interview of this confidential source was later conducted and further details were provided which confirmed the credibility of the information which the CS claimed to have obtained directly from the defendant, Joey Kyle SMELLEY.  According to the CS, SMELLEY also identified co-conspirators in the offense.  The CS stated SMELLEY had identified the other suspect who entered the home as "Cody" but was unclear on "Cody's" last name.   The CS believed "Cody's" last name was Copeland or Kirkland or something similar.  According to the CS

"Cody" was the individual who already had intimate knowledge of the residence and the victims.

In addition to the information provided by the CS, a tip was received on November 28, 2017, through Emerald Coast Crimestoppers, identifying Cody J. KURPIL as a person or interest.  According to the Crimestoppers tip, KURPIL had made remarks and bragged to the tipster that "if they find out he will do 25 years.  One home invasion in Laurel Hill had women in the home and did not go as expected."  Although the location of the original offense did not match this tip, the remainder of the Information is indicative of the Home Invasion Robbery on Hilton Road under investigation, further corroborating the information provided by the CS.

When Robert Maloney was contacted and asked as to whether he knew anyone by the name "Cody", he immediately identified Cody KURPIL as an acquaintance, and stated that at one time KURPIL had done landscaping and maintenance work at the residence.  This information from Maloney further authenticated information which had now been provided by the CS.

According to information provided by the CS, shortly after the date of the offense, SMELLEY purchased a Lincoln Towncar with his part of the proceeds from the robbery and intended on using parts from the stolen vehicle to replace and repair the vehicle be purchased.  OCSO call history records show that on September 12, 2017, SMELLEY was found walking on Hilton Road, away from an abandoned 2001 Lincoln Towncar which had run into a ditch and sustained a flat tire.  On October 3, 2017, SMELLEY was found to be operating the same vehicle and was taken into custody for traffic related offenses.  The vehicle and concern for it is discussed in multiple recorded telephone conversations between SMELLEY and others, since his incarceration at the Okaloosa County Jail.  In one such conversation, Sheila EMERSON (SMELLEY's mother) states that she had SMELLEY's 2001 Lincoln towed to her residence.  Although conversations between the two are often guarded, when put into context with the information provided by the CS, these recorded conversations support the probable cause:

On October 4, 2017, EMERSON tells SMELLEY, "I got your car . . . backed up at the house."  SMELLEY then tells EMERSON, "There's some things that go on the tires, did you see those in the trunk?  Take those and put those up.  You know what I'm talking about."

On October 18, 2017, SMELLEY asks EMERSON "Did you see in the trunk them little circle things that go inside the wheels?"  EMERSON replies, "I threw them away."  SMELLEY then states, "I been stressin' over it."

On October 20, 2017, in a conversation with his girlfriend Alyssa ROGERS, SMELLEY says, "Listen, I don't want to say too much over the phone but you know what I did right?  What me and Cody did? . . . I didn't want you involved in that and I'm still scared that Cody gonna leak something out . . . but I took care of everything, and it's pretty shitty.  I made sure Anna, and everybody was straight.  Cody and them don't have nothin' to show for the job . . . I got a car, I bought me a car."  (Anna was identified by the CS as Anna Delpozo and according to the information provided by the CS, Delpozo was among those privy to the planned robbery and was in the vehicle that dropped SMELLEY and KURPIL off on Hilton Road to approach the residence on foot.)

On an unspecified date in December, 2017 a clandestine recording device was introduced into the Okaloosa County Jail and captured several conversations involving SMELLEY.  SMELLEY makes several incriminating statements throughout this recording, however at one point, while SMELLEY is discussing the dividing of the profits, SMELLEY says that he gave his mother one of the coins (referring to the collectible silver coins) and SMELLEY has made several references to "the silver" throughout multiple, recorded jail conversations.  In further recorded conversation, SMELLEY also states, "Mom (Sheila EMERSON) took the badge away from me because I told her l was gonna be driving around busting people."  The badge, SMELLEY is referring to could only he the retired OCSO Lieutenant's badge which was in Maloney's car at the time it was stolen.  In other excerpts of recorded conversation in which SMELLEY speaks of the offense he says, "I did what I did . . . I risked my life in prison  . . . That shit

punishable by life, home invasion, armed robbery . . . I was masked up, gloves on . . ."

When speaking about press coverage of the robbery he says, "Two individuals armed . . . they didn't mention the gold . . ." This gold he refers to were the gold bars (purchased as precious metal investments) which bad been in the vehicle at the time it was stolen. He then goes on to wonder aloud, "who Dustin (SMELLEY's brother Dustin Emerson) gave that gun to. Whoever gets caught with that bitch is going down. That Glock .40." This refers to the Sheriff's Office issued Glock .40, presented to Maloney at the time of his retirement, which was also in the vehicle at the time it was stolen.

In one lengthy recorded statement by SMELLEY, he describes the events which took place inside the home. "I didn't even know he was laying in the bed, [Bruce Hoffman was asleep on the bed when suspects entered his bedroom and confronted Marilyn Maloney] all I knew was the old lady right there. I saw her to my right . . . I'd never have gone in there if I knew she was in there but there was kids in there too . . . I was in the room already when she said, 'What are you doing?' I didn't know the dude was in front of me like that. . . 1 went in his pockets got his keys, got his wallet . . . Cody was trying to get a big old flatscreen too . . . She was sitting in the chair like she was knitting or something . . . I did that like three to four days out on probation when I hit that lick." This information is all corroborated almost verbatim by the statements of Bruce Hoffman and Marilyn Maloney as to the sequence of events which occurred on September 10, 2017, to include the fact that SMELLEY bad been released from the Okaloosa County Jail on September 6, 2017 with probation for a previous offense.

(ECF No. 6-1 at 10–13 (probable cause affidavit)).

At a hearing on July 18, 2018, the court conducted a colloquy with Smelley, determined that Smelley's plea was voluntarily entered, accepted the plea, ordered a PSI, and set the cases for sentencing (ECF No. 6-1 at 26 (felony minute sheet)).

Smelley was sentenced on August 22, 2018 (ECF No. 6-2 at 43–73 (transcript of sentencing)).  Smelley's sentencing scoresheet reflected a statutory maximum of 65 years in prison and a lowest permissible prison sentence of 97.2 months (approximately 8 years) (*see* ECF No. 6-1 at 45–47 (sentencing scoresheet)).  The court sentenced Smelley to a total sentence of 20 years in prison followed by 30 years of probation (ECF No. 6-1 at 39–44 (judgment and sentence)).  Smelley did not appeal the judgment.

On February 27, 2019, Smelley filed a counseled motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 6-2 at 24–123 (Rule 3.850 motion and attachments)). The circuit court summarily denied the motion in an order rendered on July 24, 2019 (*id.* at 131–207 (order and attachments)).  Smelley appealed the decision to the Florida First District Court of Appeal, Case No. 1D19-3014 (*id.* at 208–09 (notice of appeal), 212–13 (notice of no initial brief)).  The First DCA affirmed the circuit court's decision per curiam without written opinion on March 12, 2020 (*id.* at 215–16 (opinion)).  *Smelley v. State*, 291 So. 3d 924 (Fla. 1st DCA 2020) (Table).  The mandate issued April 3, 2020 (*id.* at 217 (mandate)).

Smelley commenced this federal habeas action on October 25, 2020 (ECF No. 1).

## II.     STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[2]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court.  *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).   As with the "unreasonable application" clause, the federal court applies an objective test.  *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).  AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . .  because it was meant to be." *Richter*, 562 U.S. at 102.  The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete
> bar on federal-court relitigation of claims already rejected in state

proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

III.   SMELLEY'S CLAIMS

**A.**     **"Ineffective assistance of counsel—counsel failed to introduce medical records and/or present expert testimony in support of a downward departure."**

Smelley asserts defense counsel was ineffective for failing to introduce medical records and/or expert testimony in support of a downward departure sentence (ECF No. 1 at 5, 16–29).  Smelley alleges he has a long and well-documented history of suffering from congenital static encephalopathy (a brain abnormality), mild retardation, and mental health issues, including Attention Deficit Hyperactivity Disorder (ADHD), poor impulse control, Asperger's Syndrome (a form of autism), and anxiety with tachycardia (*id.* at 16–17).

Smelley alleges he appeared for a sentencing hearing in an earlier Okaloosa felony case in 2010 (eight years prior to his sentencing in the instant case) (ECF No. 1 at 18).  Smelley alleges at the 2010 sentencing hearing, James D. Larson, Ph.D. testified regarding Smelley's mental health disorders and defects (*id.* at 17).  Dr. Larson additionally testified that he did not believe that the Florida Department of Corrections (FDOC) could adequately treat Smelley due to the complexity of his case (*id.* at 18–19).

Smelley alleges at the sentencing hearing in the instant case, defense counsel informed the court that he was seeking a downward departure based upon Smelley's mental health issues, but counsel failed to present medical records and/or expert

testimony in support of a downward departure (*id.* at 19–21).  Smelley asserts the trial court found that the evidence was insufficient to support a downward departure sentence (*id.* at 21).

Smelley states  he presented an ineffective-assistance-of-trial-counsel (IATC) claim in his Rule 3.850 motion, arguing—as he does here—that his trial counsel was ineffective for failing to present medical evidence (documentary and/or expert testimony) in support of his request for a downward departure (*see* ECF No. 1 at 21–22).

The State concedes that Smelley presented Ground One in his Rule 3.850 motion, and "it appears" he exhausted the claim (*see* No. 6 at 17–18 & n.3).  The State contends the claim was adjudicated on the merits by the state court, and Smelley had not satisfied the standard for habeas relief under § 2254(d) (*id.* at 17–26).

### a.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If the petitioner fails to make

a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and reasonableness is measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). If the record is not complete regarding counsel's actions, "then the courts should presume that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

The Supreme Court instructed that in reviewing claims of ineffective assistance of counsel the court must be mindful of the following:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess

counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations omitted).

As to the prejudice prong of the *Strickland* standard, the petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, the petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). The petitioner must show that the likelihood of a different result is substantial, not just conceivable.

*Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). When ineffective assistance of counsel is raised in the context of sentencing, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the sentence would have been less severe. *See Glover v. United States*, 531 U.S. 198, 203–04 (2001).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### b.      Federal Review of State Court Decision

Smelley presented Ground One in his counseled Rule 3.850 motion (ECF No. 6-2 at 24–39).  Smelley attached two transcripts to his Rule 3.850 motion:  (1) the transcript of the sentencing hearing in Smelley's 2010 case, Okaloosa County Case No. 2009-CF-1990, and (2) the transcript of the sentencing hearing in Smelley's 2018 case, Okaloosa County Case No. 2018-CF-179 (the case he challenged in the Rule 3.850 proceeding (and challenges in this federal habeas case)) (ECF No. 6-2 at 40–123).  Smelley argued that if defense counsel had presented medical evidence of Smelley's mental health condition in support of his request for a downward departure under Fla. Stat. § 921.0026(2)(d), as Smelley's counsel had done at the 2010 sentencing, there was a reasonable probability the court would have imposed a less severe sentence.

Florida courts apply a two-part analysis for determining the propriety of a downward departure sentence.  First, the trial court must determine whether it **can** depart, i.e., whether there is a valid legal ground and adequate factual support for that ground in the case pending before it.  *Banks v. State*, 732 So. 2d 1065, 1067 (Fla. 1999).  To satisfy the first step, the defendant must present competent substantial evidence to support the departure.  *Id.*  If the defendant makes that

showing, the trial court must then determine whether it **should** depart, i.e., whether departure is the best sentencing option for the defendant. *Id.* at 1068. The court must weigh the totality of the circumstances in the case, including aggravating and mitigating factors. *Id.*

Florida statutes authorize a trial court to give a downward departure sentence if it finds that "[t]he defendant requires specialized treatment for a mental disorder that is unrelated to substance abuse or addiction or for a physical disability, and the defendant is amenable to treatment." Fla. Stat. § 921.0026(2)(d). A defendant who is requesting a downward departure sentence pursuant to subsection 921.0026(2)(d) must prove the following three elements by a preponderance of the evidence: (1) the defendant has a mental disorder (unrelated to substance abuse or addiction) or a physical disability; (2) which requires specialized treatment; and (3) the defendant is amenable to such treatment. *State v. Chubbuck*, 141 So. 3d 1163, 1171 (Fla. 2014). "Amenability" is defined as "'a reasonable possibility that . . . treatment will be successful.'" *Id.* at 1171 n.22 (quoting *Herrin v. State*, 568 So. 2d 920, 922 (Fla.1990)).

As previously noted, Smelley argued in his Rule 3.850 motion that defense counsel should have offered medical evidence in support of his request for a downward departure. In support of his claim, Smelley proffered Dr. Larson's

testimony at the 2010 sentencing.  At the 2010 sentencing, Dr. Larson testified as an expert in psychology and psychiatry (ECF No. 6-2 at 78–79).  He testified he interviewed Smelley and reviewed "voluminous" records, including Smelley's criminal history, psychiatric records, and medical records, including a report from a pediatric neurologist (*id.* at 79–80).  Dr. Larson testified Smelley was born premature and suffered brain damage as a result (specifically, encephalopathy or chronic inflammation of the brain) (*id.* at 80–84).  Dr. Larson testified Smelley had a low IQ "in the 60's or mildly retarded range" (*id.* at 82).  Dr. Larson testified that Smelley's former psychiatric treatment providers diagnosed him with poor impulse control, intermittent explosive disorder, Attention Deficit Disorder (ADD), Attention Deficit Hyperactive Disorder (ADHD), depression, anxiety, and Asperger's Syndrome (a "lesser form of autism") (*id.* at 81–85).  Dr. Larson testified he noted that Smelley had been involuntarily committed approximately 15 times (by the age of 18) due to suicidal attempts or self-injurious behavior (*id.* at 84, 86).

Dr. Larson testified he expected patients suffering from Smelley's medical and mental health conditions to "show poor judgment and not be compliant to medications or—nor to conform their conduct generally to the norms and mores of society" (ECF No. 6-2 at 85, 88).  Dr. Larson testified that a person with Smelley's conditions was susceptible to influence by others, lacked good judgment, and was

impulsive, but that Smelley had the capacity to understand the wrongfulness of his

conduct (*id.* at 87, 98).  Dr. Larson testified that Smelley's criminal history reflected

28 arrests (again, Smelley was 18 years old at the time of the 2010 sentencing) (*id.*

at 87–88).

Dr. Larson testified that even when Smelley was not in a penal institution, his

treatment providers were unable to keep his behavior under control:

> Q [by defense counsel].  . . . An individual with his medical
> history and his diagnoses, are—**is it possible to keep his behavior
> under control through a course of treatment and medication**?
>
> A.  Based on my review of the records, they were—in spite of
> the treatment that he had at Baptist, the adolescent treatment program,
> they couldn't keep it under control there even though that's in a
> psychiatric facility, he's Baker-acted [involuntarily committed].  So
> they moved him to what's called a PAX program, which is for adults.
> And at certain times, his behavior would be under reasonable control in
> a psychiatric facility; but as I pointed out, there were multiple
> hospitalizations during—I forgot just how long he was with DJJ
> [Department of Juvenile Justice], but I'd say ten or twelve
> hospitalizations.  So **he was never able to sustain a significant period
> of time in stability**.

(ECF No. 6-2 at 88) (emphasis added).

Defense counsel asked Dr. Larson if Smelley's condition could be adequately

treated in the Florida Department of Corrections (FDOC) (ECF No. 6-2 at 88).  Dr.

Larson answered, "Probably not" (*id.*).  Dr. Larson stated that the basis for his

answer was the FDOC's inability to provide "a complete neurological evaluation

and a complete psychological evaluation with cognitive testing," which one of Smelley's psychiatrists had recommended (*id.* at 89).  Dr. Larson testified there was no indication that the DJJ performed these recommended evaluations and testing, so Larson surmised that all state institutions lacked the resources to meet Smelley's needs (*id.*).  Dr. Larson testified he belonged to "an Internet group" and had talked to mental health providers in a number of different prisons (*id.*).  Larson testified that a forensic psychologist who he recently contacted said that resources for mental health treatment had been reduced in the prisons he had visited (*id.*).  Dr. Larson testified he recently spoke with a mental health worker in one particular FDOC institution, Santa Rosa Correctional Institution, who stated that their resources were limited, and they were providing group therapy but not individual therapy (*id.* at 89–90).

Dr. Larson opined that Smelley "has a mental disorder for which he is in need of specialized treatment, disorders unrelated to substance abuse and he's amenable to treatment" (ECF No. 6-2 at 94), which is a nearly verbatim recitation of the statutory language of the "mental disorder" mitigating circumstance, *see* Fla. Stat. § 921.0026(2)(d).  Dr. Larson followed that opinion with testimony regarding the possibility of Smelley's receiving successful treatment:

> I don't think—first of all, **it's hard to offer this man adequate treatment no matter where he is**.  Secondly, you compare the

treatment he had at DJJ versus Baptist Hospital, they weren't able to manage him at DJJ, and so he had to have multiple psychiatric hospitalizations while he was under the control of the Department of Corrections.  So Department of Corrections does have some facilities where they have a total psychiatric ward.  I haven't toured those wards, but it's hard for me to imagine that in this time of limited resources that the kind of care and treatment he needs could be adequately provided readily in a state facility.

(ECF No. 6-2 at 94) (emphasis added).

At the 2010 sentencing, Smelley was being sentenced on nine felony counts, including one count of aggravated battery with great bodily harm with a deadly weapon, which was based upon his membership of a group of persons who assaulted an individual (*see* ECF No. 6-2 at 90).  Dr. Larson testified that persons with Smelley's condition "are much more vulnerable to being influenced by others and to engage in inappropriate behavior in the community" (*id.* at 90–91).  Dr. Larson testified that Smelley's psychiatric and neurological history substantially impaired his ability to conform his conduct with the law but did not meet the legal standard of insanity (*id.* at 95–96).

Smelley addressed the court at the 2010 sentencing and requested a probationary sentence (ECF No. 6-2 at 107).  Smelley admitted he did not take his medication but promised to comply with any court-ordered treatment (*id.*).  Smelley also promised, "I won't never [sic] break the law again" (*id.*).

The 2010 sentencing court determined that despite Dr. Larson's testimony, a downward departure was not appropriate (ECF No. 6-2 at 111-14).   The court's decision boiled down to whether a downward departure sentence, meaning a non-prison sentence of community supervision, was the best sentencing option (*id.*).   The court opined that there were not sufficient resources in the probationary system to supervise Smelley and ensure his compliance with the mental health treatment he required:

> There is no [non-prison] sanction that I can impose upon him which will give him the direct supervision and assistance that he needs to be compliant with these circumstances.  I can't order that community supervision, at least in our district—I'm not sure anywhere in Florida that there is a residential program that I can place him in with the circumstances he finds himself in that would supervise him and maintain and be sure that he maintains his compliance with his course of treatment.

(ECF No. 6-2 at 112).  The court stated, "I might even go out on a limb if I felt there was some alternative where I could provide for the kind of treatment . . . [such] that supervision would work for Mr. Smelley, but there is no such thing for him." (*id.* at 113).

The 2010 sentencing court also determined that a downward departure was not appropriate under the factor that permits mitigation where the defendant's capacity to appreciate the criminal nature of his conduct or to conform his conduct to the requirements of the law was substantially impaired, *see* Fla. Stat.

§ 921.0026(c) (ECF No. 6-2 at 112–13).  The court determined that Smelley had the capacity to appreciate the criminal nature of his conduct or to conform his conduct to the law, noting that Smelley admitted he had broken the law and promised he would not do so in the future (*id.* at 113).  The court imposed a prison sentence of 94.3 months (almost 8 years) in prison, with 36 months suspended (*id.* at 114–16).

Fast forward to Smelley's 2018 sentencing.  According to Smelley's sentencing scoresheet, the statutory maximum sentence for Smelley's offenses was 65 years in prison, and the lowest permissible prison sentence was 97.2 months (approximately 8 years and 1 month) (*see* ECF No. 6-2 at 140–44).

At sentencing, Smelley's counsel requested a downward departure based upon Smelley's longstanding severe mental health issues (*see* ECF No. 6-2 at 47–48).  Counsel presented testimony from Smelley's mother, Sheila Emerson.  Ms. Emerson testified that Smelley "always had mental problems" and tried to kill himself "a lot" (*id.* at 52).  Ms. Emerson testified, "He's got something wrong with his brain when he was little, but they said that he had something with his brain.  He's always been on medication for bi-polar, depression, whatever you call it." (*id.* at 52).  The court sustained the State's objection to any further testimony from Ms. Emerson regarding Smelley's medical diagnoses (*id.*).  Ms. Emerson testified Smelley had been taking medication since he was 7 years old (*id.*).  She testified Smelley "has been on his

disability all his life for mental problems" and received a disability check (*id.* at 53–54). Ms. Emerson testified that if Smelley was released to the community, he would live with her and Smelley's stepfather (recall that during a jail conversation, Smelley and his mother discussed removing some of the stolen collectible silver coins ("them little circle things") from the trunk of the car, and Smelley admitted in another jail phone call that his mother was the recipient of one of the silver coins stolen during the burglary) (*id.* at 53).

Smelley personally addressed the sentencing court as follows:

> Your Honor, I just wanted to apologize to the courts and everybody for what I've done. I understand that I made a mistake, you know. I wasn't—I wasn't on my meds and stuff and I'm not, you know, saying that was it, but I wasn't on my meds and I was on drugs and easily influenced. But I'm sorry for everything I've done and I would just like a chance, if anything, if I can get like some help, you know, instead of just sending me to prison, I need help. I'm sorry for everything.

(ECF No. 6-2 at 55).

Defense counsel argued the following in support of the downward departure:

> I think it's very important for the Court—I think the Court does understand that he has a severe mental condition and on page nine, Your Honor, of the PSI report, the assessment and the recommendation, the alternative recommendation, disposition, I've never seen anything like that written before, Judge. And it goes on for—from page nine into page ten and it talks about all the mental health counseling sessions and that he is supposed to be taking his medications and they are recommending that he submit to random multi drug testing. . . .

And it goes on and it says, Your Honor, it says the defendant might return to an unstable environment as both he and his mother state that he has severe mental health issues that he hasn't been adequately treated for.  Mr. Smelley does not appear to have a strong support system to help ensure that he gets the extensive level of mental health treatment that he may require.

(ECF No. 6-2 at 56).

The prosecutor argued for a prison sentence of 30 years (*see* ECF No. 6-2 at 57–60).  The prosecutor noted that the primary recommendation of the PSI was incarceration in prison.  The prosecutor argued that Smelley's statements included in the probable cause affidavit demonstrated (1) he knew what he was doing when he committed the offenses, (2) he knew that his conduct was wrong, and (3) he knew that his conduct exposed him to life imprisonment.  The prosecutor argued that Smelley's criminal history demonstrated he was a danger to society.  The prosecutor further argued that the circumstances of the burglary also demonstrated he was a danger to society, specifically, that Smelley held the victims inside their bedroom, told the victims that there was a hostage in another room, demanded guns and money, and stole tens of thousands of dollars as well as a car.  The prosecutor referenced a letter written by one of the victims, Ms. Maloney, which was submitted to the court and referenced in the PSI.  The prosecutor noted that Ms. Maloney stated she suffered "severe medical complications" and "extreme stress" from the burglary,

and "starts to relive it" every time she received notifications from the court or the

State regarding the case.  The prosecutor closed with the following:

> Her [Ms. Maloney's] feeling of sanctity and safety in her home
> was destroyed by this man and his co-defendants in the case.  Your
> Honor, the defendant has a guideline score.  I don't believe that's
> appropriate.  Not at all.  Not given his prior history, his prior violence
> offenses, his prior thefts.  He was on probation for a grand theft out of
> this county and four days later committed a punishable by life offense
> by burglarizing with an assault, the victims in this case, and three new
> felony thefts while he was on probation for four days for theft.  And in
> the probable cause statement, his quote on the jail call was, "I was out
> for four days before I hit that lick".  He did not care then what his
> actions would be.  He did not care what his consequences would be with
> those actions as relevant to the victims in this case.
>
> , , , ,
>
> And finally, just to touch on a downward departure that was
> mentioned.  I presume the downward departure would be some kind of
> mental health basis that he requires treatment.  Based on the very, very
> limited testimony that we have heard today, I don't believe there is any
> factual basis to rise to the level the defense has shown a burden [sic]
> that he has something available, that he meets the qualifications for that,
> that he's amenable to receiving that treatment and benefiting from it
> and recovering from it.

(ECF No. 6-2 at 58–60).

Prior to pronouncing sentence, the court stated the reasons underlying its

sentencing decision:

> First, let me start with the easier part.  Mr. Smelley, things that courts
> traditionally do is decide the easy things first and then if they have to
> decide the more difficult things, then they move onto those.  And I
> certainly have to make that determination.

I do not have sufficient evidence to find for a downward departure under the statute.  The statute says, if you require specialized treatment for a mental disorder that is unrelated to substance abuse or addition or for a physical disability and the defendant is amenable to that treatment.   I don't have sufficient evidence to make that determination, so I'm not going to downwardly depart.

So then it comes down to what your attorney's arguing for, or at least his fall-back [sic] position and what the State is.  In the pre-sentence investigation and your attorney read it and I certainly noted that when I read the pre-sentence investigation and tabbed the pre-sentence investigation, but the biggest concern that I have at this point is the safety of the community.   And what the pre-sentence investigation says, that there isn't sufficient support to ensure that you get extensive level of mental health treatment that you may require.  I'm concerned about the safety for the community.  So that being said, a longer incarceration is the only way that I know that I can protect society.

(ECF No. 6-2 at 64–65).

The state circuit court applied the *Strickland* standard to Smelley's claim (*see*

ECF No. 6-2 at 134).  The court adjudicated the IATC claim as follows:

Defendant's scoresheet provides for a lowest permissible prison sentence of 97.2 months (i.e., 8.1 years).  During the sentencing hearing, the Court heard the testimony of Defendant's mother, who stated that Defendant "always had mental problems" and has "always been on medication for bi-polar . . . ."  She testified that Defendant had "been taking medication ever since he was about seven years old."  She testified, in regard to whether Defendant had an income, that he "has been on his disability all his life for mental problems."

Defendant testified during the sentencing hearing and indicated that at the time of the crimes, he "wasn't on [his] meds and [he] was on drugs and easily influenced."

In regard to the imposition of an appropriate sentence, the Court stated:

> [T]he biggest concern that I have at this point is the safety of the community.  **And what the pre-sentence investigation says, that there isn't sufficient support to ensure that you get extensive level of mental health treatment that you may require.**  I'm concerned about the safety for the community.  So that being said, **a longer incarceration is the only way that I know that I can protect society.**
>
> The transcript of the sentencing hearing shows that the Court was aware of mental health issues regarding the Defendant.  The lowest permissible sentence on the scoresheet is 8.1 years, so the Court could have imposed—without any downward departure—a much shorter sentence than the 20-year term of incarceration that was imposed. Consequently, based on the aforementioned circumstances, the Court finds that there is no reasonable probability that, had defense counsel presented the evidence that Defendant now claims should have been presented, the Court would have imposed a lesser sentence than the one imposed.

(ECF No. 6-2 at 136–37) (emphasis in original) (footnote citations to sentencing scoresheet and transcript omitted).  The First DCA affirmed the decision without written opinion.  *Smelley v. State*, 291 So. 3d 924 (Fla. 1st DCA 2020) (Table).

Where, as here, the relevant state court decision on the merits does not come accompanied with the state court's reasons, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal

court should then presume that the unexplained decision adopted the same reasoning. *Id.*

Smelley contends he is entitled to federal habeas relief under § 2254(d)(1), because the state court unreasonably applied *Strickland* in determining that he was not prejudiced by defense counsel's failure to present medical evidence in support of his request for a downward departure (*see* ECF No. 1 at 27–29*).*

 This court's review under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Considering the record that was before the Rule 3.850 court, the undersigned concludes that a fairminded jurist could agree with the state court that there is no reasonable probability Smelley would have received a different sentence if defense counsel had presented medical evidence like Dr. Larson's testimony.

Although Dr. Larson provided evidence regarding the first and second *Chubbuck* elements (first, that Smelley had a metal disorder, and second, the disorder required specialized treatment), his testimony regarding the third elements, i.e., the "amenability" element, was somewhat contradictory.  As previously noted, "amenability" means there is a reasonable possibility treatment would be successful for Smelley.  Dr. Larson testified, "he's [Smelley amenable to such [specialized]

treatment"; yet Larson immediately followed that testimony with the statement that, "it's hard to offer this man adequate treatment no matter where he is" (*see* ECF No. 6-2 at 94).

Moreover, even if the sentencing court would have determined that Dr. Larson's testimony satisfied all three *Chubbuck* elements, and thus satisfied the first step of the *Banks* process, there is no reasonable probability the sentencing court would have taken the second step of determining that a downward departure was the best sentencing option. Notably, the 2010 sentencing court did not depart downward despite hearing Dr. Larson's testimony. The basis for the 2010 sentencing court's decision not to depart was the absence of sufficient resources to supervise Smelley and ensure his compliance with the mental health treatment he required. Similarly, the 2018 sentencing court noted that Smelley's PSI stated that there was not sufficient support to ensure that Smelley would receive the extensive level of mental health treatment he required. Additionally, the 2018 sentencing court stated that its biggest concern was the safety of the community. Indeed, the fact that Smelley was on probation when he burglarized the Maloney home demonstrated that the safety of the community was at risk when Smelley was out of prison.

Because a fairminded jurist could agree with the state post-conviction court's conclusion, that there was no reasonable probability Smelley would have received a

less severe sentence if defense counsel had presented evidence of the nature and extent of Smelley's mental disorder, Smelly is not entitled to federal habeas relief on Ground One. *See Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2101) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."); *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 910 (11th Cir. 2011) ("[O]nly 'if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents' may relief be granted.") (quoting *Richter*, 562 U.S. at 786).

**B.**    **"Ground Two:  "Ineffective assistance of counsel—counsel failed to object to the sentencing disparity based on Petitioner's inability to pay restitution."**

Smelley asserts his co-defendant, Cody Kurpil, was more culpable than him (ECF No. 1 at 30–41).  Smelley asserts Kurpil does not suffer from the mental infirmities that Smelley suffers from (*id.* at 30).  Smelley further asserts Kurpil personally knew the victims and performed landscaping services for them (*id.*). Smelley alleges Kurpil strategically planned the robbery, and Smelley simply "followed Kurpil's lead" (*id.*).

Smelley alleges the prosecutor offered Kurpil a plea of 4 years in prison followed by 10 years of probation, but the prosecutor offered Smelley a plea of 30

years in prison (ECF No. 1 at 30).  Smelley asserts the prosecutor's stated reason for the disparity was the fact that Kurpil paid the victims $5,000 "upfront" in restitution as part of his plea deal (*id.* at 30–31).

Smelley contends defense counsel should have objected to the prosecutor's conduct on the ground that the more culpable co-defendant received more favorable treatment based upon financial status (i.e., his ability to pay restitution), in violation of Smelley's due process and equal protection rights ECF No. 1 at 32–41).  Smelley argues he suffered discrimination "at the hands of a prosecutor who abused his discretionary power" by offering leniency to the more culpable defendant because of his ability to pay (*id.* at 40).  Smelly asserts "had these issues been properly illustrated to the court—especially the fact that the victims agreed to allow Kurpil to purchase a lenient sentence, while at the same time requesting a harsh sentence for Petitioner . . . ," there is a reasonable probability the sentencing court would have imposed the lowest permissible prison sentence of 8.1 years (*id.* at 40–41).

Smelley concedes he did not exhaust Ground Two (ECF No. 1 at 7, 12, 33–34, 41).  Smelley argues his procedural default was caused by ineffective assistance of collateral counsel (*id.*).  Smelley asks the court to review Ground Two de novo, pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012) (*id.*).

The State contends Smelley failed to meet the "cause and prejudice" standard for receiving de novo review of Ground Two (*see* ECF No. 6 at 26–33).  The State contends there is no reasonable probability Smelley would have received a less harsh sentence if Smelley's trial counsel had argued that the disparities in the prosecutor's treatment of Smelley and Kurpil during the plea process violated due process and equal protection (*id.* at 26–33).

A federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right.  *Wainwright v. Sykes*, 433 U.S. 72, 84–85 (1977).  To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court."  *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray*, 477 U.S. at 488).

Before its 2012 decision in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause.  *See Coleman*, 501 U.S. at 752–53.  *Martinez* created a limited, equitable exception to *Coleman* where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-

review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland*"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." *Martinez*, 566 U. S. at 14 (citations omitted).  Accordingly, the petitioner must "establish that his collateral counsel's conduct 'fell below an objective standard of reasonableness,' and that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Hittson v. GDCP Warden*, 759 F.3d 1210, 1262 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 688).

In *Hittson*, the Eleventh Circuit explained:

> [T]he merits of the underlying claim is only a part of the *Strickland* analysis.  With unlimited time and the benefit of hindsight, a petitioner can come up with any number of potentially meritorious ineffective-assistance claims that he now wishes his collateral counsel had raised.  However, a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims.  *Murray*, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.").  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983).  "[A] per se rule that . . . the professional advocate, [is not] allowed to decide what issues are to be pressed . . . seriously undermines the ability of counsel to present the client's case in accord with counsel's professional evaluation." *Id.* at 751, 103 S. Ct. at 3313.

As we have explained, *Strickland* instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"—that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689–90, 104 S. Ct. at 2065–66. To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Thus, to show that his habeas counsel failed to provide the level of representation required by *Strickland*, [the petitioner] must show more than the mere fact they failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

*Hittson*, 759 F.3d at 1263 (footnote omitted).

Here, Smelley has not shown that his collateral counsel was ineffective under *Strickland*. As the Eleventh Circuit explained, the petitioner must show more than the mere fact counsel failed to raise a potentially meritorious claim; the petitioner must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted the claim. *Hittson*, 759 F.3d at 1263.

The omitted claim is Smelley's IATC claim based upon defense counsel's failure to argue that the prosecutor's allegedly discriminatory conduct during the plea process violated Smelley's due process and equal protection rights.

As Smelley correctly points out, a defendant has no constitutional right to plea bargaining. *Weatherford v. Bursey*, 429 U.S. 545 (1977). "[S]o long as the

prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).  As Smelley further points out, prosecutorial discretion is not unbridled.   "'[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'"  *Id.* (quoting *Oyler v. Boles*, 368 U.S. 448 (1962)); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal protection is still within the prohibition of the Constitution.").

In *Bordenkircher*, the Supreme Court held that the prosecutor did not violate the defendant's due process rights when he "carrie[d] out a threat made during plea negotiations to reindict the accused on more serious charges if he [did] not plead guilty to the offense with which he was originally charged."  434 U.S. at 358, 365.  The Court held  that "the course of conduct engaged in by the prosecutor in this case,

which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment." *Id.* at 365.

The sentencing transcript shows that the court asked the prosecutor why Smelley should not be sentenced to the 97.2 months indicated in his scoresheet, because it was "closer" to the sentence agreed to by the prosecutor in Kurpil's case (ECF No. 62-2 at 61).   The prosecutor responded that there were two "primary" reasons:  (1) Kurpil cooperated with the State and "secured" Smelley's conviction; and (2) Kurpil paid $5,000 in restitution "upfront" to the victims (ECF No. 62-2 at 61–62).   The prosecutor informed the court that the victims did not want to be reminded of the stressful events by receiving monthly restitution payments over a long period of time, and Kurpil relieved them of that by giving them "his share that he received from the theft" (*id.* at 62).[3]   The prosecutor then provided additional reasons for his recommendation of a much harsher sentence for Smelley:

---

[3] The prosecutor's assertion is supported by the letter from Marilyn Maloney, one of the victims, to the sentencing court in which she expressed the following:

> My husband and I have had to undergo serious medical treatment as a result of the stress created by this event and the proceedings related thereto.  Every time we receive a letter from the state, the trauma of that day causes me to relive that event. I wish this matter to be resolved and the individual be treated in a manner commensurate with what he did to traumatize my family.  I trust the court will sentence him accordingly.

(ECF No. 6-1 at 35).

> And additionally, beyond that, his [Kurpil's] prior convictions on his scoresheet were a couple of misdemeanor offenses. This was coming out of the blue. This was not coming out of the blue for Mr. Smelley. This has been something building for a very long time through his juvenile history. Five convictions for burglary of a conveyance, petty thefts, grand thefts, aggravated battery with a deadly weapon, resisting officers without violence, and also assault on law enforcement. Grand theft he was on probation for in this case, which is also before the Court today. And then these newest offenses from last year. This has been a long time coming. I think the sentence from the Court should [ ] take into account not only his actions in this case, but also all those that came before leading up to this.

(ECF No. 6-2 at 62–63). And even before the court asked the prosecutor about the disparity in plea offers, the prosecutor provided the following reasons for his decision to recommend a 30-year sentence for Smelley: (1) Smelley admitted he knew what he was doing and that it exposed him to significant criminal penalties; (2) Smelley's criminal history demonstrated he posed a danger to society; and (3) Smelley committed the burglary (and the other felonies with which he was charged) while he was on probation for another criminal offense (ECF No. 6-2 at 57–59).

The record clearly refutes Smelley's assertion that the prosecutor offered him a less favorable plea deal than co-defendant Kurpil based "purely" on Smelley's financial status (i.e., his inability to immediately pay restitution) rather than criminal conduct. Further, there was nothing unconstitutional about the prosecutor's rewarding Kurpil for immediately returning $5,000 of the burglary proceeds to the

victims, and not rewarding Smelley for using his share to purchase a car (within 2 days of the burglary) and give his mother a gift (one of the collectible silver coins).[4]

Considering the record, competent collateral counsel could decide to omit a claim that Smelley's trial counsel was ineffective for failing to argue that the prosecutor's conduct during the plea process was unconstitutionally discriminatory, in violation of the due process and equal protection clauses of the Fourteenth Amendment.

This leads to a somewhat new but related argument asserted by Smelley in his reply brief.   Smelley argues the sentencing court engaged in unconstitutional discrimination and violated his substantive due process rights by sentencing him to a longer prison term based "entirely" on his mental health status, not his criminal conduct (ECF No. 9 at 6–7).  Petitioner argues:

> The sentencing judge in this case made very clear that whatever sentence he intended to impose for the underlying offenses and Petitioner's criminal history, he was compelled to *extend* the length of that sentence because of the need to protect society from Petitioner's untreated mental health issues.

---

[4] A sentencing court's consideration of a defendant's ability to pay restitution is not prohibited. For example, Florida law recognizes that a defendant's ability to pay restitution may be considered in determining whether a downward departure is appropriate.  *See* Fla. Stat. § 921.0026(2)(e) (stating that a downward departure is "reasonably justified" where "[t]he need for payment of restitution to the victim outweighs the need for a prison sentence.").  The sentencing court reserved jurisdiction on the issue of restitution in Smelley's case (*see* ECF No. 6-1 at 40).

(ECF No. 9 at 6).  Citing *Robinson v. California*, 370 U.S. 660, 666 (1962), Smelley argues the sentencing court's reasoning was "flawed" and "a blatant violation of substantive due process and amounts to cruel and unusual punishment" (*id.*).

In *Robinson*, the Supreme Court considered the constitutionality of a state statute which made it a misdemeanor for a person to "be addicted to the use of narcotics." 370 U.S. at 662.  The Court noted that the statute was not one which punished a person for using, purchasing, selling, or possessing narcotics, or for antisocial or disorderly behavior resulting from the administration of narcotics. *Id.* Rather, the statute made the "status" of narcotic addiction a criminal offense. *Id.* The Court opined:

> It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease.  A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration.  But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

370 U.S. at 666 (citation omitted).  The Court held that "a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment." *Id.* at 667.

Here, the state court did not imprison Smelley simply because he was afflicted with mental disorders; rather the court imprisoned him for his criminal behavior of breaking into the Maloney's home, threatening the occupants with physical harm, and stealing their personal property.  The court punished Smelley for his behavior, not his "status" of mental illness.  This was constitutional.  Accordingly, Smelley's collateral counsel was not ineffective for omitting an IATC claim based upon defense counsel's failure to object to Smelley's sentence on the ground that it violated the Eighth and Fourteenth Amendments.

Smelley has not satisfied the second element of the *Martinez* standard (i.e., he has not shown that collateral counsel was ineffective under *Strickland*), therefore, he has not shown "cause" for his procedural default of Ground Two.  Smelley thus is not entitled to a federal merits review of Ground Two.

IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

Case No.:  3:20cv5902/LAC/EMT

2.      That a certificate of appealability be **DENIED**.

3.      That the clerk be directed to enter judgment accordingly and close the

case.

At Pensacola, Florida, this 12<u>th</u> day of October 2021.


<u>/s/ *Elizabeth M. Timothy*</u>
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**